IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JOHN GILL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:17-cv-454 (LMB/JFA) |
| ) | |
| GENPACT, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff John Gill ("Gill" or "plaintiff") has sued his former employer, defendant Genpact, LLC ("Genpact" or "defendant"), on theories of breach of contract (Count 1), quantum meruit (Count 2), violations of the Americans with Disabilities Act ("ADA") (Counts 3-5), and violations of the Family and Medical Leave Act ("FMLA") (Counts 6-7). The crux of Gill's allegations is that after he was diagnosed with fibromyalgia in December 2015, Genpact placed him on a Performance Improvement Plan ("PIP"), leading to his eventual termination; failed to reasonably accommodate his disability; and failed to award him the full bonus he was due for 2015. Before the Court is defendant's Motion for Summary Judgment [Dkt. No. 33]. For the reasons stated in open court, and more fully developed in this Memorandum Opinion, defendant's motion will be granted.

### I. BACKGROUND

The parties do not dispute that on June 19, 2014, by a letter, Genpact offered Gill the position of "Vice President—Finance Transformation." Def. Mem. [Dkt. No. 34] Ex. 10 ("Offer Letter"). Gill signed the letter the same day, id., and began working at Genpact shortly thereafter. Gill was hired as the second "Band 1 Vice President" in the CFO Consulting Group. Pl. Opp.

[Dkt. No. 37] Ex. 18 ("Gill Aff.") ¶ 13. This group, which had started in late 2013, was created to "change the focus of Genpact" from being an "operator" to being a "full service provider." Id. Genpact's original focus involved helping companies move in-house finance and accounting jobs to cheaper locations like India, the Philippines, and Eastern Europe. Id. ¶ 11. Around 2013, an outside consulting firm suggested to Genpact that it should also offer CFO consulting services to encourage its clients to engage with it as a full-service shop rather than as a one-time outsourcing consultant. Id. Based on this recommendation, Genpact created the CFO consulting group. When Gill was hired, he was put in charge of the Finance & Accounting ("F&A") consulting horizontal for the Business & Financial Services and Capital Markets ("BFS+CM") verticals. Def. Mem. Ex. 1 ("Ghosh Decl.") ¶ 14.[1]

As a consulting Vice President, Gill had three primary job responsibilities. First, he had to work with sales teams to develop business (i.e., he had to get companies interested in hiring Genpact's consulting services, often, it seems, as part of larger deals in which they would also hire Genpact's outsourcing or other services). Second, he had to develop "thought leadership"—white papers or presentations that Genpact could use to "provide [its] customers with a differentiated point of view with different types of solutions and ideas." Third, he had to develop and manage consulting teams once the group had booked contracts. Id. ¶ 15.

By the end of 2014, some friction between Gill and Ghosh had begun to show in their communications and feedback. In an email exchange in December 2014, Ghosh admonished Gill for not working well with the sales team and separately criticized him for not "own[ing]" or

---

[1] Genpact is organized into a "matrix," with horizontals (which describe specific services, like CFO consulting, that cut across industries) and verticals (which describe industries, like BFS, that may use a variety of Genpact services). When he was hired, Gill reported directly to Shantanu Ghosh ("Ghosh"), the Senior Vice President for CFO Services & Consulting (Gill's horizontal), but he also had a "dotted-line" reporting relationship to Mohit Thukral ("Thukral"), the leader of the BFS (and Insurance) verticals. Ghosh Decl. ¶¶ 4-5, 11-14.

"even tracking" specific revenue and cost figures. See Def. Mem. Ex. 14. Although Ghosh rated Gill as meeting expectations with respect to each goal in his 2014 year-end review, the written comments also showed that Ghosh had been receiving negative feedback about Gill and had some frustrations of his own. See Def. Mem. Ex. 15. For example, Ghosh wrote that Gill's first half-year "started with the right intent and focus" but that "2015 will be the year to show results" and that there was "feedback from customer and account teams about him being too generic and not taking a discussion and topic to its logical depth." Id. at 3-4. In addition, although Ghosh praised Gill's "energy and focus," he observed that Gill "needs to become a thought leader in some dimension of finance transformation" and Gill "needs to ensure he drives any topic to its required depth and conclusion." Id. at 5. Overall, Ghosh gave Gill a 3.0 ("Medium") potential rating and an HV70 performance rating.[2] Nevertheless, Gill was awarded a $142,188 bonus in March 2015 for his work in 2014. Gill Aff. ¶ 10.

Issues with Gill's performance worsened through the first half of 2015. In April, after Gill had complained to Ghosh about an employee having a one-on-one meeting with the CFO of Wells Fargo rather than including Gill in the meeting, Ghosh sent Gill an email in which he said that the "feedback about not seeing enough value through your involvement or superfluous involvement in deals and client discussions" has only "intensified" since the year-end review. Def. Mem. Ex. 17. The email went on to state: "This kind of impression feeds into a virtuous or vicious loop of confidence of people one works with. Right now you are in the vicious loop . . . . I don't believe I would do justice if I soft peddle this. I don't know of any magic formula other than two facts – (a) heads down real focused contribution in your core area and very positive and inclusive communication in all client opportunities where the internal team back progressively

---

[2] At Genpact, employees were rated as being in the top 20%, middle 70%, or bottom 10% of employees. The "HV70" rating indicates that Gill was in the middle 70%.

3

and results flow and (b) people have been there before and I have seen turnarounds. . . . I think you will have to believe in the feedback and decide it's worth your while to try and do something different." Id.[3]

Shortly after this email, Ghosh sent a separate email to Thukral and Scott McConnell, the head of the sales team, about reorganizing the F&A consulting team. See Def. Mem. Ex. 18. Ghosh proposed moving Greg Derderian ("Derderian"), who was Gill's peer in the insurance group, above Gill. In the email, Ghosh stated: "It's very clear from both of you that you don't have confidence in john gill [sic] on being the BFS lead for F&A consulting and have a better sense on confidence in Greg Derderian. In my view too, he's the better bet to lead whole of BFSI as per my plans. . . . [M]ake Greg the overall head [and h]ave John report to him and let [Greg] drive the overall BFSI agenda." Id. In addition, Ghosh noted in the email that he had already provided feedback to Gill about his shortcomings but added that he wanted to ensure that Gill had "a direct session of feedback from [Thukral and McConnell] before [they] announce[d] the change." Id. Thukral replied to Ghosh's email agreeing with the change and saying: "[T]his is the right thing to do for the company , I have heard not good feedback [about Gill] from [a high-level Genpact employee] as well in Europe , plus negative client feedback that has been shared."[4] McConnell followed up by providing Gill with feedback mostly focused on his need to improve

---

[3] According to Gill, there was "inherent friction" and a "big clash of cultures" between the sales and consulting teams at Genpact and Ghosh did not understand how a consulting group was supposed to operate. Gill Aff. ¶¶ 12-14.

[4] Gill does not contest the content of these exchanges but argues that the decision about Derderian was not a demotion but a "reorganization [as] part of an unrelated business plan," as Ghosh had previously told him that he wanted to condense his team and have either Derderian or Gill lead BFSI. Pl. Opp. 7; id. Ex. 8 ("Gill Dep.") 165:5-166:15. Regardless of Ghosh's previous plans, both Ghosh and Derderian testified that they viewed this as a demotion for Gill. Def. Mem. Ex. 3 ("Derderian Dep.") 124:15-125:3; id. Ex. 5 ("Ghosh Dep.") 44:15.

how he collaborated with the other (non-CFO Consulting) teams and to provide "[m]ore specific value propositions" to clients. Def. Mem. Ex. 21.

After Gill received this feedback, Genpact announced the organizational realignment that placed Derderian between Gill and Ghosh. One of Derderian's responsibilities as Gill's new supervisor was to complete Gill's 2015 mid-year review, which he did in September 2015. Although Derderian gave Gill ratings of "meets expectations" in every category, shortly after completing this review, Derderian was approached by Lee Kroll, a "practice lead" in F&A services who regularly worked with Gill. Kroll told Derderian that Gill was not an effective teammate. See Def. Mem. 7, Ex. 25. Based on this complaint,[5] Derderian contacted a variety of individuals with whom Gill worked to ask for feedback about his performance. From these individuals, Derderian received mixed comments that skewed negative. For example, McConnell told Derderian that a "subset of the BFS sales team will no longer engage with" Gill; that Gill is like a "hammer looking for a nail" in that he does not provide client-specific ideas; that Gill "does not utilize the coaching provided" and "comes across as non-responsive to a client ask or need"; that Gill needs "to increase his collaboration to have a chance of succeeding with Genpact"; that Gill did not "position thought leadership for Genpact"; that the sales team "[e]xpect[s] more from" Gill; and that Gill has had "[m]inimal success in the US," has "a difficult time demonstrating value," and is "not the guy you want to bring to meet a CFO." Def. Mem. Ex. 30. The same types of concerns were echoed by other co-workers, see Def. Mem. Exs.

---

[5] There is no written record of this complaint, although Derderian and Kroll have both said that Kroll relayed these concerns to Derderian. Derderian Dep. 58:18-60:13; Def. Mem. Ex. 26 ("Kroll Decl.") ¶ 6. Gill denies that Kroll complained to Derderian, Pl. Opp. 9, but he does not provide any evidence to support this denial. Gill argues that Derderian reached out to these individuals for feedback because Gill himself asked Derderian to solicit feedback from Gill's co-workers (based on a practice he had developed of 360 degree-type reviews). Either way, it is uncontroverted that Derderian talked to a variety of individuals with whom Gill had worked and memorialized those conversations.

5

31-36, and some co-workers expressed more significant personal frustration with Gill's performance. Kroll, for example, said that the sales team perceived Gill as "arrogant and condescending," that Gill was "allergic to work," and that Gill "[c]onstantly ask[s] for things to be moved to accommodate his schedule [but] then 50% of [the] time either 1) shows up late or 2) not at all." Def. Mem. Ex. 32.

Although some of the co-workers also provided positive feedback, it is uncontested that Derderian was sufficiently concerned about the feedback on the whole that he contacted Annie Kurian ("Kurian"), one of Genpact's HR professionals, to discuss putting Gill on a PIP. Although the exact timeline of their conversations is unclear, see Def. Mem. Ex. 11 ("Kurian Dep.") 28:21-30:1, what is clear is that on December 17, 2015, Derderian emailed the substantively complete[6] PIP to Kurian, Def. Mem. Exs. 37-38. In his deposition, Derderian testified that he planned to give Gill the now-completed PIP at a December 21 meeting, Derderian Dep. 142:9-:16; however, Gill canceled the meeting, explaining that he had scheduled a doctor's appointment that he needed to attend. Def. Mem. Ex. 46.

At his doctor's visit on December 21, Gill was diagnosed with fibromyalgia and told by his doctor that he should take some time off over the holidays. Id.; Def. Mem. Ex. 52. The next day, Gill informed Derderian and HR personnel that he would need to take a couple weeks off. Def. Mem. Exs. 46, 50. Derderian notified Kurian of the situation.[7] Jeff Comerford ("Comerford"), a Senior Manager in HR, told Gill to contact Genpact's leave management

---

[6] There were some non-substantive areas to be completed in the attached PIP—e.g., Derderian asked Kurian to fill in the date that Gill was hired in the appropriate field in the PIP; however, the substantive feedback and performance goals were complete. Def. Mem. Ex. 38.
[7] In this same email, Derderian told Kurian: "[Gill] did want to chat about his year end evaluation and the feedback that I have been receiving. I maintained that we have not reached a specific decision at this point and that the feedback remains as previously expressed – mixed." Def. Mem. Ex. 47.

vendor for information on the appropriate processes for short-term medical leave. Def. Mem. Exs. 47, 50. On January 11, 2016, Genpact notified Gill that he had been approved for FMLA leave for the duration of his absence and would receive short-term disability benefits for that time period. The same day, Gill informed Comerford that he had received the appropriate clearance from his doctor and would be returning to work. Def. Mem. Ex. 55.

Gill's return to work on January 11 reactivated the PIP process.[8] On January 15, Derderian sent Gill the PIP that he had substantively completed the previous month. Def. Mem. Ex. 57; id. Ex. 58 ("PIP"). The PIP identified eight goals for Gill to meet by March 31, 2016, including booking at least $5 million in consulting contracts that led to at least $3.5 million in consulting revenue, realizing personal billable utilization of 40%, providing specific thought leadership documents, completing sales team one-on-one updates, completing performance plans and goals for his subordinates, demonstrating follow-up with sales team members, adjusting his style to be more collaborative, and participating in at least 8 account planning sessions. Def. Mem. Ex. 58. The next week, on January 19, Gill responded to the PIP with his own comments, in which he acknowledged the adverse feedback in the PIP but questioned whether he could meet the various quantitative goals. Def. Mem. Ex. 60 ("I accept the report of the adverse feedback, and I am very concerned with the nature of the feedback, and want to do everything that I can to correct this, and return to a status of a highly valued employee and leader. . . . I am concerned;

---

[8] In fact, before Gill even returned to work, on January 7, he sent Derderian an email to talk about goals for the year, in which he seemed to acknowledge that he was having performance difficulties. He wrote: "How I can demonstrate success: I think it will be important for you to articulate my objectives, and we can establish milestones. I think the real test is if I can demonstrate real progress over the first half. Only you can decide if this needs to be in a formal performance plan. Either way, I think we should have a plan that shows progress over the next six months." Def. Mem. Ex. 56.

7

however [sic] the targets have been set not to return me to success, but so far above even the highest performers of my peer group. I am not sure that I will be totally successful . . . .").

Gill did not make significant progress toward the PIP's quantitative goals, and by February, he began asking around Genpact for information about how he would be paid in the event of his departure. For example, on February 2, he emailed Comerford to inquire about how his accrued leave would be paid out if he left Genpact at the end of March. Def. Mem. Ex. 62. On February 29, he mentioned to a coworker that he was looking for other jobs and inquired about when bonuses for 2015 would be distributed. Def. Mem. Ex. 61.

Also in February, Gill sent a memorandum to Kurian and Derderian, in which he complained that the PIP was unfair and retaliatory because it was issued in retaliation for his FMLA leave/disability, was designed for him to fail and force his termination by including unrealistic goals, and did not align with his previous evaluations and feedback. Def. Mem. Ex. 63.[9] Gill also wrote, "I anticipate needing reasonable accommodations should this PIP remain in place." Id. at 1. Kurian investigated Gill's allegations. Three weeks later, she sent Gill a letter, in which she explained that her investigation concluded that the PIP was neither retaliatory nor unfair and in which she responded to some of Gill's more tangential points about alleged unfair treatment. Def. Mem. Exs. 65, 66.

---

[9] Relatedly, Gill now also alleges that there was a misstatement in the PIP. The PIP says that "[p]rojected 2015 BFS F&A consulting revenue will fall significantly short of goal ($5.7M versus goal of $10.8M)." Def. Mem. Ex. 38. After the revenue numbers were finalized, it turned out that there was closer to $11 million in consulting revenue from that group (and the $11 million finalized amount was used in calculating Gill's bonus). Def. Mem. Ex. 69. Derderian has explained that he was using projected numbers when he filled out the PIP and the projections simply turned out to be incorrect. Derderian Dep. 70:19-72:3. Gill has produced no evidence showing that this explanation was a lie and it is clear that the group's overall revenue numbers were not driving Genpact's decision to place Gill on a PIP.

8

On March 8, 2016, Genpact informed Gill that he would receive a bonus of $139,500 for 2015. Def. Mem. Ex. 67. That figure represented approximately 62% of his target bonus. Id. Genpact's bonuses are calculated according to a scorecard, on which different goals are given percentage weights and individuals are evaluated according to how they meet each goal. Although Gill was given full or more than full credit in some areas (booking contracts and Total F&A Consulting Revenue), he was given only half credit in other areas. Def. Mem. Ex. 69. In particular, he was given half credit for the revenue generated by the F&A consulting group in the BFS+CM verticals (because he was demoted halfway through the year), for his thought leadership production (because he made some progress on thought leadership but did not complete the expected materials), and for his people management (because his "team ramp-up was slower than expected" and his mentoring had received "mixed feedback," although his attrition goal of less than 35% had been met).[10] Gill responded to this calculation in an email to Kurian and Derderian, in which he explained that he thought he should have been given full credit for his group's revenue and his people management.[11] Def. Mem. Ex. 68.

In early March, it became evident that Gill was not going to meet the requirements of the PIP. For example, Derderian told Gill on March 11 that he had "probably not [made] enough progress as of that date" and that, if Derderian had to rate Gill on that day, he would "have to say [Gill] ha[d] failed, or at least that [Gill] ha[d] not shown solid progress enough for [Derderian] to make a case to keep [him]." Def. Mem. Ex. 71.

A week before the end date of his PIP, Gill emailed Kurian and Derderian to request accommodations under the ADA. Def. Mem. Ex. 72. Kurian responded by sending Gill the

---

[10] Gill also received zero credit for consulting group cost numbers because the overall consulting group lost money. Def. Mem. Ex. 69. He is not challenging this calculation.
[11] He did not contest the half credit given for his thought leadership production at the time, but his Complaint now contests that reduction as well.

9

standard Genpact accommodation form and asking him to have his treating health provider fill out the form and return it to Kurian. Def. Mem. Ex. 73. Gill returned a letter signed by his health care provider that stated that Gill could perform all of his job duties but identified 11 "areas" for discussion about accommodations. Def. Mem. Ex. 77. These included:

- An opportunity to exercise and stretch during the workday, either in the morning or afternoon

- A change in ergonomically [sic] chairs to better support the back

- In-home video conferencing facilities to improve John's ability to see and hear people during conference calls

- Less worry over losing his job will remove the intense stress that he is under right now

- Less changes in job roles and realistic job goals that do not conflict with each other, e.g, how does someone devote almost half of their time to billable work and also generate $20+ million in new annual sales

- Working in a culture of mutual support and trust and collaboration (right now John feels that leadership is working toward his demise and not support and growth)

- Encouraging John to find ways to deal with his illness and supporting him in his development

- Potential breaks in work when needed, when days are bad due to his condition. Some weeks, I am sure he will be at 100%, and others will be much worse. Can there be a way to give him time off when he needs it?

- Travel accommodations: John tells me that he has no real problem with travel, and that he knows that is part of the job. Is it possible to provide better seating in flights where there is long travel?

- Opportunities for John to mentor and share and lead. When he is feeling good about his job, his symptoms will also get better, as the body is very in-tuned with emotions. Perhaps speaking opportunities and other ways to show recognition and allow John to be proud of his work.

- Possible job rotations. As I mentioned, he has no problem with the current job duties, but it might be possible to grant some rotation to other job duties. Just a thought.

Id. Kurian and Gill met on April 26 to discuss this request. Def. Mem. Ex. 82. Kurian told Gill that Genpact could provide opportunities for stretch breaks, ergonomic chairs, in-home video conferencing equipment, breaks in work when needed, and the opportunity to participate in the formal Genpact mentoring program. Def. Mem. Ex. 83. As for the other items, she needed additional information as to what he meant by having a mutually supportive culture, better travel accommodations, less change in his job role, possible job rotations, and additional specific opportunities for mentorship. Id. She also indicated that his request for less stress over losing his job was unreasonable. Id.

On April 5, 2016, Derderian informed Gill (and Gill agreed) that he had not made "significant progress" toward the revenue and personal utilization goals in the PIP. Def. Mem. Ex. 85.[12] As a result, Derderian told Gill that Genpact was going to begin the process of terminating him. Id. On May 2, 2016, Genpact terminated Gill. Def. Mem. 19; Pl. Opp. 16.

On January 9, 2017, Gill filed a Complaint in Fairfax County Circuit Court, alleging only breach of contract and quantum meruit claims under Virginia law. See Dkt. No. 1-1. After the EEOC concluded its investigation, Gill filed a First Amended Complaint [Dkt. No. 1-1], which added a variety of federal question claims, and Genpact timely removed the Complaint to this court.

In his Amended Complaint, Gill includes 7 counts. He alleges that Genpact breached a contract with Gill when it considered subjective criteria in determining whether he met the various goals on his bonus scorecard (Count 1); that even if there was no such contract, he is

---

[12] Although this is not discussed in Derderian's written summary of the conversation with Gill that he sent to Kurian, Derderian has now testified that Gill also failed the thought leadership goal and that Gill not only failed the revenue goal but that he actually booked zero dollars in contracts during the PIP period. Derderian Dep. 261:11-16. Gill does not dispute either of these representations. Pl. Opp. 16.

entitled to recover under a theory of quantum meruit or breach of an implied contract (Count 2); that Genpact violated the ADA by failing to fully engage with his requests for reasonable accommodations (Count 3); that Genpact violated the ADA by placing him on a PIP, reducing his bonus, and terminating him because of his fibromyalgia (Count 4); that Genpact violated the ADA by retaliating against him when he took medical leave and requested accommodations (Count 5); that Genpact violated the FMLA and interfered with his FMLA rights by taking adverse employment actions after Gill used FMLA leave and by terminating his employment after he requested the use of more medical leave (Count 6); and that Genpact violated the FMLA by retaliating against Gill for using FMLA leave (Count 7). Gill requests economic and non-economic damages, equitable relief (reinstatement or front pay), punitive damages, prejudgment interest, attorney's fees, and costs and expenses. In the present motion, Genpact seeks summary judgment as to all seven counts.[13]

## II. DISCUSSION

### A. Standard of Review

A party is entitled to summary judgment if the party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In general, bare allegations or assertions by the nonmoving party are not sufficient to generate a genuine dispute; instead, the nonmoving party must produce "significantly probative" evidence to avoid summary judgment. Abcor Corp. v. AM Int'l, Inc.,

---

[13] Genpact has an affirmative defense of mitigation of damages, in which it argues that Gill, who was hired but then relatively quickly fired by IBM, did not appropriately mitigate any damages he suffered. Genpact does not seek summary judgment on this affirmative defense.

12

916 F.2d 924, 929-30 (4th Cir. 1990) (quoting Anderson, 477 U.S. at 242). That being said, in ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in her favor. Anderson, 477 U.S. at 255.

### B. Analysis

#### 1. ADA Discrimination and Retaliation (Counts 4 and 5) and FMLA Retaliation (Count 7)

In Counts 4, 5, and 7, Gill claims he was placed on a PIP, given a reduced bonus, and fired because of his disability and because he took FMLA leave. To survive summary judgment on his ADA discrimination claim, Gill needs to show he had a disability, he suffered an adverse employment action, he was fulfilling Genpact's legitimate employment expectations at the time, and the circumstances of the adverse action "raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (internal quotation marks omitted). To make out either retaliation claim, he must show that he engaged in protected conduct, suffered an adverse action, and "a causal link exists between the protected conduct and the adverse action." Id. at 154.

Gill cannot make out any of these three claims because, as discussed above, the undisputed evidence establishes that Genpact was dissatisfied with Gill's performance and had already decided to put him on a PIP (and had established the content of that PIP) before Gill notified his supervisors of his disability or his intent to take leave.

Gill's failure to provide evidence sufficient to establish the performance prong of the prima facie case required for these claims dooms them. Rather than argue that he can make out a claim even though dissatisfaction with his performance led to the creation of the PIP before he notified Genpact of his disability, Gill argues that the PIP was not finalized before December 22 and that there is a variety of evidence suggesting that the PIP was pretextual. With respect to the

13

first argument, Gill can only point to a single cryptic email on December 22 from Derderian to Kurian, in which Derderian tells Kurian that Gill had been asking about the process but Derderian "maintained that we have not reached a specific decision at this point." Given the deposition testimony of Derderian and Kurian, who say the PIP was finalized before December 22, and the email sent from Derderian to Kurian on December 17 that attached the substantively complete PIP,[14] this single cryptic email does not create a genuine dispute of fact.

Moreover, any claim that the PIP was a pretext for discrimination or retaliation is defeated by the uncontested evidence of plaintiff's unsatisfactory performance. There is ample evidence in the record of complaints from a variety of customers, coworkers, and supervisors about Gill's performance before December 2014. Moreover, the uncontested evidence is that, after being placed on the PIP, Gill did not come anywhere close to meeting the quantitative goals outlined in the document. To support his allegations of pretext, Gill merely argues that there were inaccuracies in the PIP, that Kurian was a conflicted investigator who should not have investigated his allegations of retaliation/discrimination, and that Genpact did not consider any impact Gill's illness may have had on his performance. See Pl. Opp. 22-23. As discussed above, the projected consulting revenue included in the PIP differed from the eventual finalized number; however, that the projections were lower than the final number does not establish any pretext. In addition, although it is not clear how Gill's other allegations—even if true—establish pretext,

---

[14] Gill argues that the Court should not evaluate this email because a portion of it has been redacted for attorney-client privilege. To support this proposition, he cites only a Second Circuit case, in which the court held that a criminal defendant who asserts that he had a good faith belief that his conduct was legal implicitly waives attorney-client privilege with respect to communications about the legality of his conduct. Pl. Opp. 27 (citing United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991)). This case is inapplicable, as Genpact is not asserting any claim that necessarily requires looking at attorney-client communications, nor is Genpact attempting to disclose some privileged conversations and withhold others. Moreover, as Genpact explains, Gill never raised this concern during discovery and never moved to compel the disclosure of the redacted information. Def. Reply [Dkt. No. 38] 16 n.15.

Gill sent his complaint and request for investigation to Kurian (and did not, at the time, request that a different HR employee conduct the investigation) and Gill never suggested to Derderian or Kurian that his poor performance was caused by his disability. Because the PIP was written before Genpact knew of his disability, neither the decision to place him on the PIP nor the PIP's content can logically be causally connected to his disclosure of his disability or his decision to take leave. Therefore, Gill cannot make out a claim of either discrimination or retaliation in violation of the ADA or retaliation in violation of the FMLA and Genpact's motion for summary judgment will be granted as to these counts.

2. ADA Failure to Accommodate (Count 3)

To make out a failure to accommodate claim, Gill must show that he had a disability, Genpact had notice of the disability, he could have performed the essential functions of his position with reasonable accommodations, and Genpact refused to make such accommodations. See Wilson v. Dollar General Corp., 717 F.3d 337, 345 (4th Cir. 2013). In addition, once an employee makes a request for an accommodation, the employer has a duty to engage in an interactive process to evaluate whether a reasonable accommodation can be made. If the employer fails to engage in this process and the employee can show that a reasonable accommodation exists, then the employer may be liable for failure to accommodate. Id. at 347.

Gill's failure to accommodate claim is a bit of a moving target. In his Amended Complaint, he seems to allege that Genpact failed to engage in an interactive process because, after he asked for an accommodation, they fired him rather than trying to participate in an interactive dialogue. Am. Compl. ¶¶ 207-213. In his opposition to summary judgment, Gill seems to shift focus, arguing that he actually made accommodation requests in January and February of 2016 and that Genpact failed to engage in an interactive dialogue by not responding

to those requests. Pl. Opp. 25. Gill also argues that he could have performed the essential functions of his job "with the accommodation of relief from the requirements and stress" of the PIP. Id.

Setting aside whether Gill's requests in January 2016 and February 2016 were sufficiently specific to trigger Genpact's duty to engage in an interactive process and whether Gill's requested accommodation of "relief from the requirements and stress" of the PIP was reasonable, Gill cannot meet his burden on this claim because he has introduced no evidence to suggest that, with less stress, he could have met Genpact's expectations. As discussed above, Gill did not come anywhere close to meeting the quantitative goals laid out in the PIP, and there is no evidence from which a reasonable jury could conclude that less stress would have enabled Gill to go (for example) from booking $0 in contracts to booking $5 million in contracts or from producing zero thought leadership to producing three pieces of thought leadership. Therefore, Gill cannot make out a claim for failure to accommodate and Genpact's motion for summary judgment will be granted on this count.

### 3. FMLA Interference (Count 7)

Gill's FMLA interference argument is really two separate arguments. First, he argues that his "termination in May 2016 denied Gill of [sic] his ability to take more FMLA leave" because he could not take FMLA leave once he was no longer employed. Pl. Opp. 21. Second, Gill argues that he was wrongfully terminated because he took FMLA leave and that this is cognizable as an interference, and not just a retaliation, claim. Id. Taking Gill's second argument first, the Court need not decide whether this sort of allegation gives rise to an interference claim. Even assuming it does, it is the same substantive claim as the retaliation claim and it will be rejected for the same reason: the PIP was substantively complete before Gill notified Genpact of

his decision to take FMLA leave. Therefore, neither defendant's knowledge of plaintiff's condition nor his taking FMLA leave and requesting an accommodation could have been motivating factors for placing Gill on a PIP. And his failure to come close to fulfilling the PIP's goals rebuts plaintiff's claims that the reasons for his termination were pretextual.

Moreover, Gill cites no authority to support the proposition that an employer cannot terminate an employee who has notified the employer that he might need to take additional FMLA leave in the future. Genpact responds to this argument by citing out-of-circuit case law that indicates that it is not an FMLA violation for an employer to fire an employee who has requested FMLA leave if the employer's decision to fire the employee is not because of the FMLA request. See Def. Reply 10-11 (citing Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 961 (10th Cir. 2002)). Although the Fourth Circuit does not appear to have explicitly adopted this approach, it has signaled agreement with it by citing Smith in a related context. See Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 549 (holding that a plaintiff's claim for FMLA interference cannot go forward where the employer eliminated the plaintiff's position while the plaintiff was on FMLA leave and the employer can demonstrate that the elimination of the position was for reasons unrelated to the FMLA leave). Moreover, this is certainly the better rule—an employee cannot buy himself unqualified job protection by notifying the employer that he may take FMLA leave at some point in the future. Therefore, because the undisputed facts establish that Gill's termination was unrelated to his request for potential future FMLA leave, he cannot sustain an interference claim and Genpact's motion for summary judgment will be granted as to this count.

#### 4. Breach of Contract and Quantum Meruit Claims (Counts 1 and 2)

In Counts 1 and 2, Gill claims that Genpact breached a contract with him when it gave him a reduced bonus for 2015 based on a determination that he did not meet (or that he was not personally responsible for the group meeting) the metrics laid out in his bonus scorecard or, in the alternative, that he should recover under a quantum meruit/implied contract theory because he conferred a benefit on Genpact.[15] The breach of contract claims fails because Gill cannot establish that he and Genpact had a contract for the payment of the bonus according to any specific metrics. The Fourth Circuit has held that, under Virginia law, a company does not make a contract offer when it outlines the parameters of a discretionary compensation system. Jensen v. IBM, 454 F.3d 382, 388 (4th Cir. 2006); see also Taylor v. CNA Corp., 782 F. Supp. 2d 182, 203 (E.D. Va. 2010) ("Given the discretionary nature of the bonuses, Taylor has not demonstrated an enforceable obligation on the part of CNA . . . ."). Genpact's offer letter makes clear that bonuses are discretionary. See Offer Letter ("This position is bonus eligible under the Genpact 2014 bonus plan, which, in the Company's sole discretion, rewards individuals for success on individual goals and objectives. . . . This bonus is not guaranteed.").

Gill's only evidence that there was a sufficiently definite agreement to form a contract is that, when asked whether the scorecard constituted "an agreement between the employee and the employer," Derderian first said, "I don't know if I would characterize it that way, but okay," and, when pressed about whether he would disagree with that statement, said, "I don't disagree with

---

[15] In his brief, Gill states generically that he "was not paid his bonus in March 2016 according to the metrics of his 2015 scorecard." Pl. Opp. 20. His Amended Complaint provides slightly more context, as it alleges that Genpact "improperly and arbitrarily consider[ed] subjective criteria for measuring Gill's success when it should have used only objective criteria in measuring Gill's performance" on the group revenue, thought leadership, and people management goals. Am. Compl. ¶ 183.

that." Pl. Opp. 20; id. Ex. 5 118:5-:10. This relatively noncommittal statement from Derderian[16] is not enough to convert the obviously discretionary bonus system into a firm offer sufficient to support a breach of contract claim, and Gill offers no case law supporting this proposition.

In addition, under Virginia law, Gill can only recover under a theory of implied contract if he can show that he conferred a benefit on Genpact, Genpact knew he conferred the benefit, and Genpact retained the benefit under "circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." Nossen v. Hoy, 750 F. Supp. 740, 745 (E.D. Va. 1990). Genpact claims that a salaried employee cannot, as a matter of law, bring an implied contract action for recovery of a discretionary bonus, Def. Mem. 30, and supports this argument by citing to a Virginia Circuit Court (rather than a Supreme Court) case, see Appleton v. Bondurant & Appleton, P.C., 68 Va. Cir. 208, 225 (Va. Cir. Ct. 2005) ("[A]n at-will salaried employee . . . should not be able to recover for unjust enrichment because the payment of a salary represents payment for work performed during the term of such employment . . . ." (internal quotation marks omitted)). Although it is not clear whether this is a firmly established principle of Virginia law, Gill fails to respond[17] and, at the least, has not introduced sufficient evidence to create a dispute of fact about whether or not the $465,000 he received in salary and bonus for his employment in 2015 was reasonable compensation. Therefore, Gill cannot recover

---

[16] Gill characterizes Derderian as Genpact's 30(b)(6) designee. Pl. Opp. 20. Derderian was deposed in both his individual capacity and as a 30(b)(6) designee, but he was not designated as a corporate representative under any of the topics relating to bonus calculation or compensation. See Def. Reply Exs. 7, 8. Indeed, Genpact's 30(b)(6) designee on those topics testified unequivocally that the bonus system "is not a contract and not a guarantee." Def. Reply Ex. 4, at 46:18-:22.

[17] Gill's entire argument supporting his theory is: "If the Court views this agreement as not express, or not clear enough, then the equitable doctrine of quantum meruit is pled in the alternative and should be allowed to be tried to the Court in its equitable power." Pl. Opp. 20.

under either a contract or implied contract theory, and Genpact will be granted summary judgment as to this claim.

III. CONCLUSION

For the reasons stated above, Genpact's Motion for Summary Judgment [Dkt. No. 33] will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 13th day of November, 2017.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge